## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. *10-80057-CR-MARRA/HOPKINS*

18 U.S.C.§ 371
18 U.S.C.§ 1589
18 U.S.C.§ 1592
18 U.S.C.§ 1546
18 U.S.C.§ 1001 (a)(3)

**UNITED STATES OF AMERICA**

**vs.**

**SOPHIA MANUEL, and**
**ALFONSO BALDONADO, JR.**



FILED by _____ D.C.

APR 2 2 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

### INDICTMENT

The Grand Jury charges that:        **BACKGROUND**

At all times material to this indictment:

1.        Quality Staffing Services Corporation, a for-profit corporation, with its principal

place of business at 4400 N. Federal Highway, Boca Raton, Palm Beach County, Florida, is a

labor recruiting company, and is owned and operated by defendants SOPHIA MANUEL and

ALFONSO BALDONADO, JR.

2.        Defendant SOPHIA MANUEL is the Vice-President and Operations Manager and

defendant ALFONSO BALDONADO is the President of Quality Staffing Services Corporation.

3.        Defendants SOPHIA MANUEL and ALFONSO BALDONADO reside on

Buttonwood Drive, Boca Raton, in the Southern District of Florida.

3

4.     DAR Workforce Solutions USA, Inc., a Florida for-profit corporation, is a labor recruiting company with its principal place of business in Miami or North Miami Beach, in the Southern District of Florida, and was registered during the conspiracy as a foreign corporation in the Philippines with the Philippine Overseas Employment Administration.

5.     Placewell International Services Corporation is a Philippine private licensed labor recruiting agency with offices in Manila and other cities in the Philippines.

6.     Philippine Overseas Employment Administration (hereafter referred to as POEA) is the Philippine government's primary regulatory body on overseas employment.

## COUNT 1
### (Forced Labor Conspiracy)

7.     The allegations contained in paragraphs 1 through 6 of this Indictment are incorporated herein and by reference.

8.     From in or about July 2006, and continuing through in or about June 2008, in Palm Beach County, in the Southern District of Florida and elsewhere, defendants SOPHIA MANUEL and ALFONSO BALDONADO, and others known and unknown to the grand jury; did knowingly and willfully combine, confederate, conspire and agree with one another and others known and unknown to the grand jury to hold Filipino nationals in a condition of forced labor by knowingly providing and obtaining the labor or services of the Filipino nationals by means of:

(a)     any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; and

2

(b)     the abuse or threatened abuse of law or the legal process.

## Object of the Conspiracy

9.     The object of the conspiracy was to obtain a cheap, compliant, and readily available labor pool, using false promises regarding the terms of employment and pay to induce the Filipino nationals to incur significant debts to pay up-front recruitment fees; and to compel the Filipino workers' labor and services through threats to have the workers arrested and deported knowing the workers feared that arrest and deportation would result in serious economic harm and possible incarceration for nonpayment of debts.

## Manner and Means

10.     It was part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. and co-conspirators known and unknown to the grand jury entered into a business venture in or about 2007, in the Southern District of Florida and elsewhere, to bring 50 workers from the Philippines to the United States under the federal seasonal and temporary H2B nonimmigrant program to work at country clubs and hotels.

11.     It was further part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR., together with co-conspirators known and unknown to the grand jury, recruited 50 Filipino nationals to come to work as servers at country clubs and hotels in the United States by enticing them with false promises of high wages and two to three years of steady employment in the United States.

12.     It was further part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. and co-conspirators known and unknown to the grand jury, knew each Filipino worker paid substantial recruitment fees, including their air fare, requiring them to incur substantial debts to secure the country club and hotel server jobs in the United States.

3

13.     It was further part of the conspiracy that defendant SOPHIA MANUEL, signing as Vice-President and Operations Manager of Quality Staffing, falsely represented to the U.S. Department of Labor Employment and Training Administration in her June 2007, Application for Alien Employment Certification that she had 50 full-time country club server positions available to fill between October 1, 2007, through July 1, 2008.

14.     It was further part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. had no work or infrequent work for many of the Filipino workers and did not pay the workers the promised wages, making it difficult to impossible for the workers to repay their debts in the Philippines.

15.     It was further part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. when told by the Filipino workers that their earnings were insufficient to repay their debts, the defendants responded that was not their problem.

16.     It was further part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. confiscated the Filipino workers' passports and visas when they arrived in the United States, thereby limiting the workers' freedom of movement.

17.     It was further part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. imposed house rules requiring workers to seek permission to leave the house, restricted the hours a worker could seek permission to leave, and typically requiring an escort, thwarting the Filipino workers' ability to seek help from outsiders.

18.     It was further part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. supplied the Filipino workers inadequate food and housing and denied necessary medical care causing the workers to lose weight, be worn down, become ill, and suffer from constant fatigue.

19.     It was further part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. screamed at, scolded, and berated the Filipino workers causing the workers to be demoralized and scared.

20.     It was further part of the conspiracy that defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. regularly threatened to call USCIS (immigration) agents or the police to arrest workers, or threatened to call their contacts in Washington DC or the Filipino Embassy, about workers who violated the house rules, complained about lack of work, not being paid, inadequate food, or confiscation of passports, and threatened that agents would detain, handcuff, arrest, and deport the workers, all of which made the Filipino workers fear the defendants.

## Overt Acts

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, at least one of the co-conspirators committed or caused to be committed at least one of the following overt acts, among others, in the Southern District of Florida and elsewhere:

21.     On or about June 27, 2006, the defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR., through their corporation Quality Staffing, entered into a written agreement with Boca Woods Country Club Association, Inc., a Florida corporation, to fill Boca Woods' seasonal labor needs and per the agreement Boca Woods agreed to pay Quality Staffing $50,000 to cover expenses to recruit and process a minimum of 10 foreign national workers.

22.     In or about July 2006, defendant SOPHIA MANUEL held a recruitment meeting in the Philippines to bring Filipino nationals to the United States and collected a $1,500 job security deposit from each of the approximately 36 Filipino nationals which was never returned nor were the promised jobs arranged.

23.     Between in or about March 16, 2007, through August 2007, defendant SOPHIA

MANUEL, signing as Vice-President and Operations Manager of Quality Staffing, falsely represented to the U.S. Department of Labor Employment and Training Administration in her June 2007, Application for Alien Employment Certification (ETA Case No. A-07178-25616), that she had 50 full-time country club server positions available to fill between October 1, 2007 through July 1, 2008.

24.     On or about June 15, 2007, defendant SOPHIA MANUEL, signing as Vice-President and Operations Manager of Quality Staffing Services Corp., sent a letter "To Whomever It May Concern" that provided an officer of DAR Workforce, a person known to the grand jury, with the authority to act on behalf of Quality Staffing in matters relating to H2B workers' visa processing in the Philippines.

25.     In or about June 2007, defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. d/b/a as Quality Staffing Services Corporation ("Quality Staffing") entered into an agreement with DAR Workforce Solutions USA, Inc. ("DAR Workforce"), working with Placewell International ("Placewell"), to recruit and facilitate Filipino nationals coming to the United States to work under the H2B program.

26.     Between in or about July 2007, through August 2007, defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. traveled to the Philippines, interviewed applicants at the Placewell office in Manila; represented to applicants they would be paid $1,400.00 a month salary, overtime at $10.00 an hour, and provided additional part-time jobs; and defendant SOPHIA MANUEL represented to applicants that the initial period of employment in the United States was for nine months but would be extended to three years.

27.     In or about June 2007, through October, 2007, defendant SOPHIA MANUEL directed Placewell officers or employees to fill in the blanks on the DAR Workforce contract

indicating a two-year period of employment, a monthly salary of $1,400, and overtime pay at an $10 hourly rate.

28.     Between the Summer and Fall of 2007, Placewell employees, whose identities are known to the grand jury, directed the Filipino nationals they were processing for Quality Staffing to sign two separate contracts, one between Quality Staffing and the individual employee, and one between DAR Workforce and the employee: the two contracts contained different terms and conditions of employment.

29.     Between the Summer and Fall of 2007, Placewell employees, whose identities are known to the grand jury, directed the Filipino nationals to only show the DAR Workforce contract to the POEA and not to show it the U.S. Embassy or the US immigration officials upon entering the United States: the DAR contract provided a two-year term of employment, $1,400 monthly salary, $10 an hour for overtime pay, free airfare to and from the United States, free accommodation, and free emergency medical and dental services and free facilities including medicine.

30.     Between the Summer and Fall of 2007, Placewell employees, whose identities are known to the grand jury, collected recruitment fees and expenses in the approximate amount of $4,000 from each Filipino applicant and instructed the applicants only to disclose that each had paid $100 USD to U.S. Embassy officials and to say the employer paid the airfare and other fees.

31.     Between the Summer and Fall of 2007, Placewell employees, whose identities are known to the grand jury, directed the Filipino nationals to show the Quality Staffing contract and not to show the DAR Workforce contract to the U.S. Embassy and U.S. immigration officials upon entering the United States: the Quality Staffing contract provided a nine month period of employment and wages of $6.67 an hour.

32.     In or about October 2007, defendant SOPHIA MANUEL confiscated, at her

residence, the passports of approximately 10 arriving Filipino nationals, including CB, a Filipino national, whose identity is known to the grand jury.

33.     On or about November 11, 2007, defendant SOPHIA MANUEL confiscated, at her residence, the passports of approximately 13 arriving Filipino nationals.

34.     On or about November 26, 2007, defendant ALFONSO BALDONADO, JR. confiscated the passports of several newly arriving Filipino nationals, including AA, a Filipino national, whose identity is known to the grand jury.

35.     Between on or about November 11, 2007, through December 2007, defendants SOPHIA MANUEL and ALFONSO BALDONADO directed the approximately 30 Filipino workers to sleep on the floor at their residence in the living room, dining room, kitchen, and garage, until housing was located, without beds and bedding, men and women side by side.

36.     On or about November 11, 2007, when the Filipino nationals arrived at SOPHIA MANUEL and ALFONSO BALDONADO'S residence, SOPHIA MANUEL directed the Filipino nationals not to leave the house unless they received permission and then only during designated hours.

37.     Between October 2007, through February 2008, defendant SOPHIA MANUEL and other house managers, whose identities are known to the grand jury, required the Filipino workers, when authorized to leave the premises, to sign a log book stating their name, date, time out, purpose, intended destination, and time in.

38.     Between approximately October 2007, through February 2008, defendant SOPHIA MANUEL and other house managers, whose identities are known to the grand jury, prohibited Filipino workers from opening the refrigerator except when tasked to cook; screamed

and scolded workers if they ate food from the refrigerator without permission; and limited workers to a diet of rotten vegetables, chicken innards and feet.

39.     Between approximately November 2007, through February 2008, house managers at separate housing facilities, whose identities are known to the grand jury, told the Filipino workers that they enforced defendants SOPHIA MANUEL and ALFONSO BALDONADO's orders and reported house activities back to SOPHIA MANUEL and ALFONSO BALDONADO, JR.

40.     Between approximately October 2007, through February 2008, Filipino workers who wanted to attend church were escorted by defendant ALFONSO BALDONADO'S relative, whose identity is known to the grand jury, and instructed by defendant SOPHIA MANUEL not to talk to people nor mingle with other Filipinos at church.

41.     Between approximately October 2007, through February 2008, defendant SOPHIA MANUEL threatened Filipino workers at meetings that if any of Filipino workers left the house she would call the police or "USCIS" (United States Citizenship and Immigration Services), and they would be deported.

42.     Between in or about October 2007, through February 2008, defendant SOPHIA MANUEL, in the presence of defendant ALFONSO BALDONADO, JR. regularly threatened to arrange the deportation of the Filipino workers or to send them home.

43.     Between in or about October 2007, through December 2007, defendant ALFONSO BALDONADO, JR. would wake up the Filipino workers in the middle of the night, and quiz the workers on table set up and drink recipes, and scold them or make them stand in the corner as punishment for answering incorrectly.

44.     Between in or about October 2007, through February 2008, defendant SOPHIA

MANUEL, singled out RE, a Filipino worker, whose identity is known to the grand jury, and stated in front of other Filipino workers, that RE needed to be taken to the airport to be deported and that he would be handcuffed.

45. Between in or about October 2007, through February 2008, defendant SOPHIA MANUEL told the Filipino workers that a manager, whose identity is known to the grand jury, had left but that he had returned because she had reported him to "USCIS" and that out of fear he had returned to her employment.

46. Between approximately October 2007, through February 2008, defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. frequently shouted, banged on the table, and demeaned the Filipino workers.

47. Between October 2007, through February 2008, defendant SOPHIA MANUEL told JT, a Filipino worker, whose identity is known to the grand jury, he would have to pay SOPHIA MANUEL $10,000 to release him.

48. Between October 2007, through February 2008, at worker meetings defendant SOPHIA MANUEL stated that if anyone wanted to leave or transfer to another company they would have to pay her between $10,000 to $15,000 USD.

49. In or about January 2008, after CA, a Filipino worker whose identity is known to the grand jury, slipped and broke his wrist, defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. refused CA's requests for medical treatment for approximately 10 days.

50. Between October 2007, through February 2008, defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. refused medical treatment for RT, a Filipino worker whose identity is known to the grand jury, who was suffering from stomach pain and spitting up blood.

51. On or about December 7, 2007, after ICE agents visited SOPHIA MANUEL and

ALFONSO BALDONADO's residence in Boca Raton, Florida during an investigation of another matter and having received information concerning Quality Staffing's business operations, defendant SOPHIA MANUEL advised the Filipino workers that one of the ICE agents was her friend and she could call him and have the Filipino workers deported.

52.     Between in or about December 2007, through February 2008, at a meeting in the garage of the Oaklake house, where some of the Filipino workers were housed, workers complained to defendant ALFONSO BALDONADO, JR. that they had no food and ALFONSO BALDONADO, JR. became angry, threw a chair, kicked the garbage can, and screamed at NP, a Filipina worker whose identity is known to the grand jury, demanding to know if she ate three meals a day in the Philippines.

53.     Between in or about December 2007, through February 2008, defendant ALFONSO BALDONADO, JR. instructed the Filipino workers to lie to ICE agents and tell them everything was okay and he also directed them to sign a false statement that they received free housing and transportation.

54.     Between in or about December 2007, through February 2008, defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. told PS, a Filipino worker whose identity is known to the grand jury, when he complained that the drinking water was bad, they would give him muriatic acid to drink, which the workers knew was a toxic substance.

55.     On or about January 10, 2008, a sign was posted at the Oaklake house under the name of defendant SOPHIA MANUEL, instructing the Filipino workers not to leave the staff house without notifying her; that leave time was limited to off-duty workers between 11:30 am to 2:30 pm and only with her permission; that between 5:30pm and midnight workers should check with house supervisor for permission to leave; and workers were required to initial the sign by their names to show they had read the sign.

56.     On or about January 21, 2008, defendant ALFONSO BALDONADO, JR. confiscated the passports of approximately five Filipino nationals, whose identities are known to the grand jury, when they arrived at defendants' residence in Boca Raton, Florida.

57.     In or about February 2008, defendant SOPHIA MANUEL, after repeatedly rejecting a worker's pleas to visit a very ill grandmother, SOPHIA MANUEL relented, but advised MA, a Filipina national whose identity is known to the grand jury, that she could only go for three days and if she was not back within three days MANUEL would deport the worker's husband, who also was employed by Quality Staffing, and MANUEL would report the worker to USCIS.

58.     On or about February 8, 2008, after 13 Filipino workers left the service of the defendants, SOPHIA MANUEL and ALFONSO BALDONADO, JR. called a meeting of the remaining workers at the business office on Federal Highway in Boca Raton, Florida, and defendant SOPHIA MANUEL stated that the 13 workers would be deported, sent home in handcuffs, and put in jail; and further stated that the 13 workers would pay millions of dollars for destroying her reputation, and that she has many lawyers.

59.     Sometime after February 8, 2008, when the 13 workers left, and within hearing of the remaining workers, ALFONSO BALDONADO, JR. called an unknown person and asked if the person knew a gangster who could "erase" the 13 absconded workers.

All in violation of Title 18, United States Code, Sections 371 and 1589 (a) (2) and (3) (2004) (amended by Public Law 106-386, effective December 23, 2008 and recodified as Title 18, United States Code, Section 1589 (a)(3) and (4).

## COUNT 2
(Document Servitude Conspiracy)

1.     The allegations contained in paragraphs 1 through 59 of this Indictment are

incorporated herein and by reference.

2.      From in or about October 2007, and continuing through on or about March 2008, in Palm Beach County, in the Southern District of Florida and elsewhere, defendants SOPHIA MANUEL and ALFONSO BALDONADO, JR. and others known and unknown to the grand jury did knowingly and willfully combine, confederate, conspire and agree with one another to hold the victims, approximately 39 Filipino nationals, whose identities are known to the grand jury, in a condition of document servitude by knowingly destroying, concealing, removing, confiscating, and possessing any actual or purported passport or other immigration document, or any other actual purported government identification document of another person:

(a)      in the course of a violation of 18 U.S.C. § 1589;

(b)      with intent to violate 18 U.S.C. § 1589; and

(c)      to prevent or restrict or attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons.

All in violation of Title 18, United States Code, Sections 371 and 1592.

### COUNT 3
(Visa Fraud)

1.      The allegations contained in paragraphs 1 through 59 of this Indictment are incorporated herein and by reference.

#### Background: Agency Authority and the H2B Visa Petitioning Process

At all times material to this Indictment:

2.      The Department of Labor (DOL) was responsible for administrating,

regulating and enforcing the provisions of 20 CFR Part 655, Subpart A, which governs the labor certification process for temporary employment of aliens in the United States under the H2B classification and requires that the Certifying Officer of the Employment and Training Administration ("ETA") issue temporary labor certifications on behalf of the Secretary of Labor. DOL adjudicates all petitions for temporary foreign workers to fulfill seasonal or peak need jobs that can not be filled by United States workers. An H2B temporary labor certification is advisory to USCIS and where the employer is notified by the DOL that certification is denied or cannot be made, the employer may submit countervailing evidence, according to 8 CFR Part 214.2(h) directly to USCIS.

3. USCIS is the government agency that oversees lawful immigration to the United States. USCIS adjudicates the petitions and applications of potential immigrants and is therefore responsible for administering, regulating, and enforcing the various visa programs, petitions and applications available to aliens coming to or residing in the United States, including the H2B temporary nonagricultural worker visa.

4. Under United States laws and regulations, non-citizens of the United States ("aliens") are not permitted to work in the United States unless they obtain employment authorization from the United States Government.

a. Aliens living outside of the United States can apply for a non-immigrant visa referred to as an H2B visa. The H2B visa permits aliens to work in the United States for a specified, temporary period of time, generally not to exceed on year.

b. An employer seeking to employ temporary foreign employees is required to use a process involving at least three steps and at least three government entities: a state labor agency, DOL, and Department of Homeland Security USCIS.

14

c.      The state workforce agency in Florida is the Agency for Workforce Innovation ("AWI").

5.      A prospective employer is required to file a DOL Application for Alien Employment Certification ("ETA-750") with the state labor agency, in this instance, AWI. The application sets forth the name and address of the employer, actual location where aliens will work, the job description, the rate of pay, qualifications required, number of available jobs, and dates of expected employment. The employer must also describe in detail efforts to recruit qualified United States workers and the results of those efforts. The ETA-750 application must be completed and signed under penalty of perjury. The state labor agency reviews the ETA-750 to ensure that the employer is offering the prevailing wage for the job listed in the ETA-750. The ETA-750 is reviewed by the state labor agency and forwarded to DOL for consideration and certification.

6.      If DOL approves the ETA-750, DOL issues the certified ETA-750 with an original stamped certification and a "Final Determination Letter," indicating that the request for temporary foreign workers has been certified based upon the ETA-750 and its supporting documentation.

7.      After DOL issues a certified ETA-750, the employer must submit the original ETA-750, along with a Petition for Non-Immigrant Worker ("I-129") together with supporting documents to USCIS. The I-129 petition is signed under penalty of perjury. In the I-129 petition, the employer represents that there is a specific job to fill and describes the nature, location, terms, and requirements of the job. If USCIS approves the I-129 petition, USCIS designates the number of H2B temporary foreign worker positions approved on the I-129 and the employer is notified of the approval. USCIS generates a Notice of Action ("I-797") and a copy is sent to the employer and the appropriate United States Embassy.

8.      Aliens seeking to enter the United States as H2B temporary workers are required to complete an Application for a Nonimmigrant Visa ("DS-156"). The alien must submit the DS-156 form to the United States Embassy or United States Consulate in the country from which they are applying.

9.      When the appropriate United States Embassy or Consulate receives the approved I-797 from USCIS, the United States Department of State may issue H2B visas to qualified aliens.

10.     When an alien receives an H2B visa, the alien is permitted to apply for entry into the United States but must work only for the petitioning employer.

### Visa Fraud

11.     Beginning on or about March 2007, and continuing through on or about January 2008, in Palm Beach County, in the Southern District of Florida and elsewhere, defendant SOPHIA MANUEL and others known and unknown to the grand jury did knowingly and willfully commit visa fraud by:

(a)     knowingly subscribing as true a false statement with respect to a material fact in any application including the U.S. Department of Labor Employment and Training Administration form 750 (ETA-750 Application for Alien Employment Certification), and other documents required by the immigration laws or regulations prescribed thereunder; and

(b)     knowingly presenting to a United States federal government agency or department any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact.

All in violation of Title 18, United States Code, Section 1546 (a) (paragraph 4).

## COUNT FOUR
(False Written Statements)

1.     The allegations contained in paragraphs 1 through 59 of this Indictment and Count Three of this Indictment are incorporated herein and by reference.

2.     Between on or about August 2, 2007, and August 9, 2007, in the Southern District of Florida and elsewhere, the defendant

### SOPHIA MANUEL

in a matter within the jurisdiction of the United States Department of Labor, Employment and Training Administration, an agency of the executive branch of the Government of the United States, did knowingly and willfully make and use a materially false writing or document, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, namely, the defendant SOPHIA MANUEL, made and used fictitious letterhead in the name of Boca Greens Country Club and made and used a fictitious letter dated August 2, 2007, that contained a forged or fictitious signature above the typed name of Anthony Cammarrano, General Manager, and contained materially false statements that Boca Greens Country Club intended to fill a seasonal peak-load need with an additional 20 temporary/permanent personnel/employees utilizing Quality Staffing from October 15, 2007, through June 30, 2008, when in truth and fact, the defendant SOPHIA MANUEL well knew that she made and used the fictitious letterhead in the name of Boca Greens Country Club and it was not the actual letterhead of Boca Greens Country Club; that she made and used a fictitious letter dated August 2, 2007, that contained a forged or fictitious signature above the typed name of Anthony Cammarrano, General Manager, and was not the signature of Anthony Cammarrano; and that the letter contained materially false statements that Boca Greens Country Club intended to fill a seasonal peak-load need with an additional 20 temporary/permanent personnel/employees utilizing

17

Quality Staffing from October 15, 2007 through June 30, 2008 when she well knew that Quality

Staffing was not authorized by Boca Greens Country Club to fill 20 positions from October 15,

2007, through June 30, 2008, and that defendant SOPHIA MANUEL used the fictitious letter

when she submitted it to the U.S. Department of Labor Employment and Training Administration

as part of her 2007 Application for Alien Employment Certification (ETA Case No. A-07178-

25616),

In violation of Title 18, United States Code, Section 1001(a)(3).

A TRUE BILL

_____
FOREPERSON, GRAND JURY

JEFFREY H. SLOMAN
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLOIRDA

SHANIEK MAYNARD
ASSISTANT UNITED STATES ATTORNEY

THOMAS E. PEREZ
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

SUSAN FRENCH
TRIAL ATTORNEY
HUMAN TRAFFICKING PROSECUTION UNIT
CIVIL RIGHTS DIVISION
U.S. DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA                CASE NO. _10-80057-Cr-Marra/Hopkins_

vs.

**CERTIFICATE OF TRIAL ATTORNEY***

SOPHIA MANUEL, ET AL.,

_____ Defendants. /

**Superseding Case Information:**

**Court Division**: (Select One)

|  |  |
|---|---|
| _____ Miami | _____ Key West |
| _____ FTL | _X_ WPB _____ FTP |

New Defendant(s)          Yes _____   No _____
Number of New Defendants
Total number of counts      _____

I do hereby certify that:

1.  I have carefully considered the allegations of the information, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:     (Yes or No)     _NO_
    List language and/or dialect    _____

4.  This case will take    _7_    days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)                              (Check only one)

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | _____ |
| II | 6 to 10 days | _X_ | Minor | _____ |
| III | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | _X_ |
| V | 61 days and over | _____ | | |

6.  Has this case been previously filed in this District Court? (Yes or No)    _NO_
    If yes:
    Judge: _____    Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?     (Yes or No)    _NO_
    If yes:
    Magistrate Case No. _____
    Related Miscellaneous numbers: _____
    Defendant(s) in federal custody as of    _NO_
    Defendant(s) in state custody as of    _NO_
    Rule 20 from the _____    District of _____

Is this a potential death penalty case? (Yes or No)    _NO_

7.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    _____ Yes    _X_ No

8.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    _____ Yes    _X_ No

_Shaniek Maynard_
SHANIEK M. MAYNARD
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0522201

*Penalty Sheet(s) attached                                REV 4/8/08

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** **SOPHIA MANUEL**

**Case No:** *10-80057-CR-MARRA/HOPKINS*

Count #:  1 and 2

 Conspiracy.

 18 U.S.C. §371

**\* Max.Penalty**:        up to 5 years' imprisonment; 3 years' supervised release; $250,000 fine.

Count #: 3

 Visa fraud.

 18 U.S.C. §1546

**\* Max.Penalty**:        up to 10 years' imprisonment; 3 years' supervised release; $250,000 fine.

Count #: 4

 False statement.

 18 U.S.C. §1001

**\* Max.Penalty**:        up to 5 years' imprisonment; 3 years' supervised release; $250,000 fine.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: **ALFONSO BALDONADO, JR.**

Case No: *10-80057-CR- MARRA / HOPKINS*

Count #: 1 and 2

Conspiracy.

18 U.S.C. §371

* **Max.Penalty**:        up to 5 years' imprisonment; 3 years' supervised release; $250,000 fine.